```
               UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK

------------------------------X Docket#
UNITED STATES OF AMERICA,      : 22-cr-00158-ENV-10
                               :
                               :
    - versus -                 : U.S. Courthouse
                               : Brooklyn, New York
CHEN, et al.,                  :
                               : September 22, 2023
              Defendants       : 3:41 p.m.
------------------------------X
```

TRANSCRIPT OF CRIMINAL CAUSE FOR BAIL APPEAL
BEFORE THE HONORABLE ERIC R. KOMITEE
UNITED STATES DISTRICT JUDGE

**A    P    P    E    A    R    A    N    C    E    S:**


**For the Government**:          **Breon S. Peace, Esq.**
                               United States Attorney


                      **BY:  Sophia Suarez, Esq.**
                            **Matthew R. Galeotti, Esq.**
                            Assistant U.S. Attorneys
                            271 Cadman Plaza East
                            Brooklyn, New York 11201



**For the Defendant**:           **Sarah M. Sacks, Esq.**
                               Epstein Sacks PLLC
                               100 Lafayette Street, Ste. 502
                               New York, NY 10013



**Transcription Service**:       **Transcriptions Plus II, Inc.**
                               61 Beatrice Avenue
                               West Islip, New York 11795
                               RL.Transcriptions2@gmail.com



Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

THE COURT:  Please be seated.

THE CLERK:  Criminal Cause for Bail Appeal, *United States of America v. Chen*, docket number 22-cr-158.

Would you all please state your appearances for the record starting with the government?

MS. SUAREZ:  Good morning, your Honor.  Sophia Suarez for the United States.  And with me at counsel table is AUSA Matthew Galeotti.

MR. GALEOTTI:  Good afternoon, your Honor.

THE COURT:  Good afternoon.

MS. SACKS:  Good afternoon, your Honor.  Sarah Sacks for Yichu Chen who's sitting next to me.

THE COURT:  Good afternoon to you both as well.

THE CLERK:  And the interpreter, raise your right hand.

(Interpreter sworn)

THE CLERK:  State your name for the record, please.

THE INTERPRETER:  First name Tuo, T-U-O.  Last name Huang, H-U-A-N-G.

THE CLERK:  Thank you.

THE COURT:  Okay.  So we're here for a bail appeal.  Why don't we hear from the government first?

MS. SUAREZ:  Yes, your Honor.  The government's

3

Proceedings

here today requesting that the Court revoke the order setting conditions for this defendant's release.  As your Honor knows and as is briefed in the papers that we filed last night, the motion on this, the standard on this motion, I apologize, is de novo review.

The government respectfully submits that there's no condition or combination of conditions that will reasonably assure either the safety of the community or any one person or this defendant's appearance in court in the future in this case.

Beginning with dangerousness, the proffered facts of the charged crime alone are enough to establish that this defendant is a danger to the community.  He was hired online to commit an assault in exchange for money.

THE COURT:  Hired online?

MS. SUAREZ:  Online meaning by the WeChat message application.  It's similar to WhatsApp or Telegram, but it's Chinese based and so I don't know if the Court's familiar with it.

The defendant drove from New York to Virginia with two others who are also charged in this case.  In Virginia, when they arrived at the designated apartment unit --

THE COURT:  So I read, for what it's worth, the transcript of the hearing before Judge Pollak.  What do

4

Proceedings

you know about the defendant's prior relationship with his co-defendants?

MS. SUAREZ:  Your Honor, the government's theory at this time is that this defendant did not have a prior relationship with his co-defendants and was hired by co-defendants.  You know, was basically offered money in exchange for committing an assault which is not uncommon in this case.  We have other assailants like him who have been charged in this case who were offered money in exchange for committing an assault.

THE COURT:  So he's reached out to by strangers saying would you like to commit an assault on our behalf? We'll pay you.

MS. SUAREZ:  So on WeChat I understand that users are able to, you know, basically message others and I understand that one co-defendant was tasked basically with identifying and recruiting potential assailants. Whether or not he was referred to by somebody else or responded to some kind of ad on WeChat I'm sure is in the evidence.  I just don't know it right now.  But that is basically what happened here.

THE COURT:  Okay.

MS. SUAREZ:  So I assume that your Honor knows about the zip ties, that he used a rolling pin or baton to viciously beat this woman who --

Transcriptions Plus II, Inc.

5

Proceedings

THE COURT:  Sometimes this baton is referred to as an electric baton.  I'm not sure what that is.  And I'm also not sure why the uncertainty.

MS. SUAREZ:  The uncertainty, your Honor, comes from the fact that the victim, and you know, obviously this is an advanced disclosure of in sum and substance victim statements, but the victim -- what I am able to say today is the victim stated that she felt like it may have been some kind of electric baton as opposed to a regular baton because of the unbearable pain that she was experiencing.  But it's possible that it was another blunt force object that did not have electric current.

THE COURT:  Okay.  What's the best case, and by best case I mean a case in which either a district judge or better yet the Second Circuit is writing to say that the lower level judge, either district judge or magistrate judge, erred in releasing a given defendant?  Best case in the sense of allegations like we are dealing with here or better for you even less serious allegations.

MS. SUAREZ:  I don't know that your Honor needs to make a finding that Judge Pollak erred yesterday as opposed to hearing all the facts and reaching your independent conclusion that there is no set of conditions or combination of conditions that would warrant his

Proceedings

release.  That's what I understand the law to be.  I'm happy to confer --

THE COURT:  No, I agree with you on the (indiscernible) standard and I am considering this case de novo.  I'll be clear about that.  At the same time, magistrate judges like Judge Pollak, see hundreds if not thousands of these cases and so their views are persuasive at the very least.  And so I'm looking for some objective marker that would say that there's something unreasonable about the conclusion, or something just wrong about the conclusion that Judge Pollak reached here.

MS. SUAREZ:  Certainly, your Honor.  In this case alone other magistrate judges in this district have concluded that a co-defendant in this case who has committed just an assault has been detained in this case. I need to confer with counsel for a minute if I can about whether or not that was on the same sort of record that we have here or perhaps on something less in terms of the defense package.

THE COURT:  Yes.  And also obviously there are questions about ties to the United States and other factors as well.

(Pause in proceedings)

MS. SUAREZ:  Your Honor, in this case I can

Proceedings

represent that two co-defendants in this case, who did not themselves commit the assaults but instead were part of recruiting or directing some of the assaults and helping in planning, did present bail packages and were ordered detained for dangerousness and risk of flight. And so that is one example.

Obviously, these cases, matters such as this, are extraordinarily fact dependent and so, you know, there is an array of cases about the conduct, about the risk of flight, about other factors with the defendant at hand. In a lot of those cases, at least that I've seen, judges often ask or say, you know, since the time of the offense conduct this person has been a part of the community and living in the community and there hasn't been any issues and perhaps there was an aberration. And that's where -- and I know it was in a brief that we filed yesterday, but it's important to note that this defendant, after the offense conduct merely six months ago, is the subject of a probable cause to arrest for having assaulted yet another person, the photos of which were submitted by email last night and counsel also received them.

And so to the extent that we're wondering what might he do if he was released to the community, well beyond what happened three years ago in this case, just

8

Proceedings

six months ago he took a verbal dispute and escalated ut into a fight in which there was bruising, laceration to a cheek, and some kind of neck brace that was required once that victim was seen by a medical professional.

THE COURT:  Yes.  Okay.  All right.  Let me hear from defendant's counsel, please.

MS. SACKS:  Thank you, your Honor.

THE COURT:  One question I'm particularly interested in is your letter indicates that some of what were then the proposed sureties owned property and yet no property, as far as I can tell, was offered or posted. Is that for a reason?  Is that something that's still in play?  How are you thinking about that?

MS. SACKS:  Well certainly, Judge Pollak had inquired about it and could have set that as one of the conditions but she did not.

THE COURT:  Are they offering?

MS. SACKS:  No.  I would have to have that further conversation.  And look, agreed that the standard is de novo, but I think your Honor really hit on something here in looking at what took place yesterday. And I can tell you that -- and you can certainly tell by the record that Judge Pollak really considered this. This was a strongly contested bail application.  Nothing that the government has put in their papers is new.  All

9

Proceedings

of that was in front of Judge Pollak.

You're right, magistrate judges hear bail arguments day in and day out.  That's what they do. Judge Pollak of all judges is probably the most senior magistrate judge in this courthouse and has tons of experience with bail, bail hearings.

THE COURT:  Tell me about your client's work history.  What does he do at the car dealership or did he do?

MS. SACKS:  He's a salesman at the car dealership.  Before that he worked at a local restaurant and a local karaoke spot.

THE COURT:  A salesman paid on the books at the car dealership presumably?

MS. SACKS:  Paid by commission.

THE COURT:  Paid by commission how?  By check presumably?

MS. SACKS:  By cash and check.

THE COURT:  Cash and check.  But he has a documented work history there.  Is that correct?

MS. SACKS:  Yes, yes.

THE COURT:  Okay.  And how long was he there?

MS. SACKS:  Over a year.

THE COURT:  Okay.

MS. SACKS:  He graduated from high school two

10

Proceedings

years ago.  And I'm sure that your Honor saw in my submission that he didn't go to just any high school.  He happened to have gotten into a very selective high school and graduated from there.  It's now ranked, the High School of Math, Science, and Engineering I believe is now ranked number one of all New York City public schools.  So again, you know, there is something different about this defendant.

I'll also just point out --

THE COURT:  But that, if anything, that seems to make this even more of a puzzle, right?  He's accused of very serious criminal conduct.  The government I think makes a fairly credible case that the evidence against him appears to be strong.  You've suggested there may be some coercion or duress defense but there is no actual content even alleged, no specific factual content even alleged to support that at this point.  This is highly, highly antisocial behavior for somebody who's otherwise well educated and gainfully employed and --

MS. SACKS:  Well Judge, he was 18 years old at the time.  And when you look at the facts, again, I haven't -- I mean I just got my first ping of discovery in this case this morning, have not had an opportunity to even start to look at it.  I spent my whole day at Fordham Law School until now, so --

11

Proceedings

THE COURT:  Doing what?

MS. SACKS:  I'm an adjunct at Fordham.

THE COURT:  Oh, what do you teach?

MS. SACKS:  First year legal writing.

THE COURT:  Nice.

MS. SACKS:  So I think based on even the black and white facts of this, you have an 18-year-old kid, two gangsters much older, gangsters who are co-defendants in this case who are charged with the criminal enterprise with interstate prostitution already on the face of that. And this is three years ago.  Right?

Judge Pollak, they made the same arguments about this fight at a party and Judge Pollak basically said I'm not really concerned about that and here's why. Right?  A fight at a party almost six months ago, that is clearly not a conviction for any conduct on behalf of my defendant.  You talk to the people at the party, you're going to find different stories of what happened.  Right?

MS. SUAREZ:  Your Honor, if I may, that's --

THE COURT:  Hold on just one second.

MS. SACKS:  Who knows who started the fight? Who knows who was the aggressor?  Who knows may have been drinking what including their so-called victim?  We don't know what led to any sort of bruising.  You don't know what my client looked like after that night.  So this was

12

Proceedings

an aberration three years ago.  The male mind they say is not really formed and specifically, sorry, adolescents in general, but particularly males.  And this is science, not my own --

THE COURT:  No, but this is going to cut both ways.  Right?  I think I know what you're going to say about brain development, prefrontal cortex development finishing later but --

MS. SACKS:  Yeah.  There's no allegation that even if what they say is true that he was hired to do an assault, that he knew what he was getting in that car and going to Virginia with two gangsters for.  There is no allegation about that.

So in that sense it does cut the other way that here is a kid who is educated, right, has now had his high school degree, right?  It's unfortunate that he hasn't been able to go to college and that has to do more with his economic circumstances than anything else.

THE COURT:  Okay.

MS. SACKS:  But I think when you look at Judge Pollak's decision, she is not -- again, I pulled a little bit her reputation on bail, she is not necessarily a pushover.

THE COURT:  Yes, I'm eminently familiar with Judge Pollak's extremely accomplished history as a judge

13

Proceedings

and prior.

Did the government want to say something about the I-Card event?

MS. SUAREZ:  Yes, your Honor.  And a couple of other things if the Court will entertain it.

On the I-Card offense, Judge Pollak yesterday, and it's in the transcript, said that she wasn't focused on that offense because she was so focused on the disturbing violence that was already charged in the case, not because she made any finding discrediting or doubting the April 2023 assault.

THE COURT:  But what do we know?  We know that there's a photo of the other guy and we know that there's an I-Card that was issued.  But we don't know much I think about how we get there.  Is there a factual recitation of how this, what you call a spat, or maybe the defense calls a spat, unfolded?

MS. SUAREZ:  Yes, your Honor.  Based on the New York City Police Department report that the government and law enforcement have reviewed, this is not a party of 100 plus people and things might have gotten confused or out of hand.  Based on witness statements, this was a small party at an apartment and both someone who resides in the apartment and one other, at least one other witness, stated that it was a small get together inside

14

Proceedings

the apartment.  This defendant specifically and another male attendee were in a verbal dispute.  And based on the facts of the NYPD report, at least the witness statements, this defendant sort of abruptly or out of nowhere escalated what was otherwise a verbal disagreement into him assaulting him.

Also, I'll note that the government is not aware of any police report of this defendant filing and stating that he also was injured in this altercation.  By the witness accounts that are in the NYPD report, he was the assailant and the other person was categorically the victim.

THE COURT:  Okay.

MS. SACKS:  Judge, if I may?

THE COURT:  But you don't know what -- I mean --

MS. SUAREZ:  So much so that the I-Card is not an I-Card for investigative purposes, the I-Card is probable cause to arrest and NYPD did try to arrest him in June and he wasn't home, and they since that time over the summer tried contacting other people that lived in the vicinity that they met that day to say he had returned home, and had been told that he was not or did not receive an answer.

THE COURT:  Okay.  So you filed photographic

15
Proceedings

evidence last night on this subject?

MS. SUAREZ:  Yes.

THE COURT:  I don't think I got that.

MS. SUAREZ:  I have copies if you'd like me to hand them up.

THE COURT:  Well, yes.

MS. SUAREZ:  May I approach?

THE COURT:  Please.  Now, how did these photos get taken?  The police are called to the party?  Or this person goes to a precinct and reports the assault?  Like what transpires?  This looks -- well, I was going to speculate that these photos look like they were taken perhaps in the hospital bed.  There seems to be some tubing in the background but I'm not precisely sure what to make of that.

MS. SUAREZ:  The police responded to the hospital and not the apartment.

THE COURT:  Okay.  So this person seeks medical attention and then --

MS. SUAREZ:  Either he or somebody at the hospital called 911.

THE COURT:  Okay.

MS. SACKS:  Judge, if I may?

MS. SUAREZ:  And --

THE COURT:  Yes, let's one at a time, then

16
Proceedings

you'll wrap this up.

MS. SUAREZ:  Okay.  I will wrap this up, your Honor.  I just wanted to address two other points that defense counsel made.

MS. SACKS:  I wasn't even finished with my points so I'm hoping I'm going to get an opportunity to speak.

THE COURT:  Yes.  For sure.

MS. SACKS:  Okay.

THE COURT:  I'm sorry.  I just wanted to --

MS. SACKS:  No, but there was an objection and then an interjection, so I'm just hoping that I'm going to be allowed to make a full argument.

THE COURT:  Yes, you are.  And please also rest assured like you're saying a lot of the things you said to Judge Pollak and I, for what it's worth, have read that.  But yes, I will surely hear from you before we conclude here.

MS. SUAREZ:  I just want to touch on the point, your Honor, about the gangsters and the coercion and the ages just to not leave that hanging out there.

The co-defendants that were with him that day were in their 20s.  To the extent that there is an age gap, this is not an age gap to the extent that defense counsel might be hoping it is.

17

Proceedings

THE COURT:  No, I understand that.  But the whole thing is a little mystifying in the sense that people who want to conspire with others to commit acts of violence against employees don't usually reach out to random strangers via texting apps, at least in my experience as a judge and/or prosecutor.  And so the whole story is just a little unformed it seems to me at this stage.

MS. SUAREZ:  I can answer that by saying, your Honor, that in this case the evidence supports that not just as to this defendant, but multiple co-conspirators in this case were essentially reached out to either because a friend of theirs was already committing assault and he was sort of a referral, but outreached through some other mechanism.  But many co-conspirators in this case were basically reached out to, asked if they wanted a couple of hundred bucks to commit an assault and agreed to do so.

THE COURT:  All right.  But as of now the defendant is on electronic monitoring with a GPS component, correct?

MS. SUAREZ:  Well, as of now the defendant is detained but that is what Judge Pollak was willing to order yesterday, yes.  Or did order yesterday.

THE COURT:  Okay.

18

Proceedings

MS. SACKS:  Home incarceration.

THE COURT:  Do you have the passport yet?

MS. SACKS:  Yes.

MS. SUAREZ:  If he is being released, he has to turn over the passport, yes.

THE COURT:  Okay.

MS. SACKS:  He's turned it over to Pretrial. And by the way, this is a very stringent bail package. Home incarceration --

THE COURT:  I think I have the bond.

MS. SACKS:  -- with his mother.  He'd have to live with his mother.  I mean these are very specific conditions here.

THE COURT:  The thing that is most mystifying to me from the defense perspective is why, if there are sureties in court prepared to sign a bond for him who own property and who are being asked to bring whatever moral suasion might be associated with that, why they're not simply posting the property.  One person owns an apartment, one person owns a nail salon.  I think for some reason that seemed -- Judge Pollak I saw asked about that but it did seem to fall through the cracks, or at least just not come back up again.

MS. SACKS:  I think she didn't require it.  I think she saw the package with six suretors and his being

19

Proceedings

on home incarceration with all the other conditions was stringent enough. But if that's what your Honor is going to set, then that's different. But she clearly did not think that that was necessary. These are people who had means and moral suasion over my client.

But just to get back to --

MS. SUAREZ: I just want to say before I turn it over, if your Honor's inclined to release him on bond, I would like an opportunity to be heard on the suretors.

THE COURT: Okay.

MS. SACKS: So that she can impeach all the suretors? I mean in the writing I mean, with all due respect, grasping at straws. He has to live with all five of the suretors. He happens to live with three of them now because two of them are flat mates. Right? They're not just neighbors, they're flat mates. I don't know if your Honor --

THE COURT: How does the residence work now? It's an apartment of how many bedrooms and --

MS. SACKS: It's a three or four bedroom apartment in flushing. And it's quite common I think in the community there to have people who -- I mean to call them roommates almost sounds like a misnomer because you've got a 21-year-old who happens to be living with -- I mean again, his mon has to live there now. That's a

Transcriptions Plus II, Inc.

20

Proceedings

requirement.  But not just his mother, one of the so-called roommates is 68 years old and a full-time nanny. The other one, I didn't catch her age but she seemed at least in her 60s.  You know, these are immigrants who are hardworking people who can't afford to get a full apartment for themselves.  I think it's pretty common in that community to have those sort of living circumstances.

I think it's also telling though about his character that he's a 21-year-old and on the record yesterday they're talking about how he's a nice and respectful young man, no 21-year-old antics, right?  That he's living harmoniously with his flat mates.

But I'm hoping that this -- I'm happy to address any issues that the government has with the suretors.  But again, I think it's -- I don't think it's a strong argument but I'm happy to address it.

I think that their statement about what Judge Pollak did or did not say with respect to this party fight --

THE COURT:  I don't see it as being all that relevant.

MS. SUAREZ:  Yeah.  Okay.

THE COURT:  What I do think is relevant is whether the suretors would be willing to post property.

21

Proceedings

And if it's worth taking a ten minute break and seeing if you could reach them, I think we should do that.

MS. SACKS:  Judge, just to mention too, we had a courtroom today because it's a new day.  I had suretors and friends and family in the courtroom yesterday, working people who all took the day off.

THE COURT:  I'm not asking them to show up.

MS. SACKS:  But I don't -- right.  So they were here to --

THE COURT:  I'm asking whether we can ascertain their position.

MS. SACKS:  Right.  I don't know that I'm going to be able to get that in a short break but if that's -- if you want me to ask, I can --

THE COURT:  Yes, let's try.  It may be relevant to the outcome here.  I will take a ten-minute break at this point and we will reconvene here on the record at let's say 20 after 4 just to be safe.  Thank you all.

(Off the record)

THE CLERK:  We're back on the record in *United States of America v. Chen*.

THE COURT:  Ms. Sacks?

MS. SACKS:  Yes.  Unfortunately, with me being the only one who has a cell phone here and people not knowing phone numbers by heart --

22

Proceedings

THE COURT: Right.

MS. SACKS: -- and not having all the parties present and people having to have much more serious conversations -- just for instance, Ms. Hesseltine, who I'm sure you noticed on the record --

THE COURT: I saw her in the pictures.

MS. SACKS: -- you may recognize her from the photos, is in the courtroom, and she is one of the suretors. Again, that's I think quite unusual, as I said yesterday, to have a high school teacher continue to have such a lovely and close relationship with a student and his family and to have co-signed his bond, a New York City public school teacher. She lives in a house. She owns it together with her husband. She certainly can't make any decisions about putting their house up. And I think that would be a really onerous ask.

THE COURT: Yes.

MS. SACKS: I mean look, there are potentially some others and potentially some other property. I mean these --

THE COURT: I mean I'll tell you why I ask. So the government wants to talk about the sureties of whom there are a number, six in the final analysis, right? And the Bail Reform Act requires that to the extent we're going to rely on sureties to execute the bond, they need

23

Proceedings

to be "solvent" sureties.  And I have no idea as I sit here about the solvency of any of these people.  We don't know anything about their liabilities.  I don't know anything about their assets either.  And we could obviate that fairly expeditiously if there was a piece of real property in the mix.

MS. SACKS:  Some of them proffered some of their financial situation to the Court.  Certainly, there's also moral suasion.  We have the amounts that they make.  And Mr. Ma, who is my client's landlord, owns the apartment that he lives in and has $100,000 in savings.  I mean that's not nothing.

THE COURT:  No, it's definitely not nothing but I don't know what the mortgage is or --

MS. SACKS:  And we're talking about, again, this kids steps outside, so much as steps outside of his apartment, the buzzer is going to go off.  He has no means to flee.  I mean I wasn't even heard on this notion of what a sentence may look like in this case and I certainly the government, what they're saying is a definite ten years is anything but when you look at all the facts.  You know?  And the 20 somethings who were in the car with him were gangsters.  They charged them for being in a criminal enterprise.  This wasn't their first rodeo.  They were in the prostitution business.  The

24

Proceedings

people that they describe who bail was denied, they were recruiting people, part of this enterprise.  It wasn't an isolated instance.  All we have as to my client is an isolated instance over three years ago.

THE COURT:  Is this a presumption case?

MS. SUAREZ:  It's not, your Honor.

THE COURT:  Why?

MS. SUAREZ:  It is not because -- I don't have it in front of me but I looked at it before when I was in the office.

THE COURT:  Well, the presumption -- we're looking at (f)(1) to see the list of presumption cases, right?

MS. SUAREZ:  Correct.

THE COURT:  3142(f)(1).

MS. SUAREZ:  Correct.  We're here because of the dangerous weapon and dangerous weapon, while firearm and destructive device are included in the presumption, dangerous weapon is not.

THE COURT:  No, but I must be reading this incorrectly because (f)(1)(A) lists a crime of violence and my question is one would have thought this was a crime of violence.

MS. SUAREZ:  He's charged with Hobbs Act robbery conspiracy which after *Barrett 2* is no longer a

Transcriptions Plus II, Inc.

25

Proceedings

crime of violence in the circuit.

THE COURT:  Oh, we have a categorical approach issue.

MS. SUAREZ:  Correct.

THE COURT:  Okay.

MS. SACKS:  I mean look, and that presumption is certainly rebuttable.

THE COURT:  Oh, I understand that.  But you all see where I am sitting right now which is we have a defendant who is indicated now in this district for what the government has reported as an extremely severe beating.  And we have a proffer of evidence from the government that to my ear sounds strong as these things go especially given the digital evidence.

On the other side, we have the fact that -- well, and on the government's side, before I get to your side, we have the fact that the defendant has strong ties.  He's a legal permanent resident here.  Legal resident or legal permanent resident?

MS. SUAREZ:  He's a legal permanent resident, your Honor.

THE COURT:  Yes.  So green card holder, legal permanent resident here, but somebody with strong ties to another country from which I think it's fair to say extradition is difficult at best.  And we have the fact

26

Proceedings

often recognized over and over again by the Second Circuit that electronic monitoring has its limits.

On your side of the equation, we have the fact that the defendant has lived here for a long time, has strong ties to the community in Queens, has no criminal record before this case, and has a number of contributing upstanding members of the community stepping up here as sureties on his behalf.

MS. SACKS:  No means to flee.

THE COURT:  What does that mean?

MS. SACKS:  He's got $500 in a bank account. He has no means to flee.

THE COURT:  Okay.

MS. SACKS:  Your Honor, I hope that the Court understands that in effect this may be the most important decision in his life.

THE COURT:  The decision I'm making right now?

MS. SACKS:  Yeah.  And here's why.  Statistics show that defendants who get bail overwhelmingly have better outcomes in their cases.

THE COURT:  What's the difference?

MS. SACKS:  That they have the chance to prove themselves while they're out on bail.  They ultimately have a better outcome in terms of how their case finishes, whether it's a better sentence, whether it's a

27

Proceedings

result of trial.

THE COURT:  I mean in order for that to be meaningful you'd have to effectively control for all of the reasons why those people get bail in the first place. Right?  We may just be having a sample problem in that people who qualify for bail should be expected to have better outcomes than people who don't.

MS. SUAREZ:  But I think Judge --

THE COURT:  And a lot of the social science research I've seen in this area I'm just saying is not well done.  Let's leave it at that.

MS. SACKS:  I think Judge Pollak also saw that.

THE COURT:  Saw what?

MS. SACKS:  That she wants to give him a chance to prove himself on bail.

THE COURT:  I want to do that too.  Everybody here, I won't speak for the government, but of course he should have an opportunity to prove himself on bail.  It would be perhaps better all things considered if he was allowed to continue to work while on bail which I know is not a part of the conditions that Judge Pollak set, but --

MS. SACKS:  But she did say that if he shows that he's in compliance that that's something that we would then apply for.

28

Proceedings

THE COURT:  Yes.  No, and I would suggest that to whoever is the district judge who inherits this case as well.  But we are talking about a set of facts that involve not just the very serious conduct alleged here but also what the government -- also let's say non-trivial evidence that the defendant committed a second very serious assault resulting in extremely serious injuries.

MS. SACKS:  On that issue, Judge, you know --

THE COURT:  And so what I would have expected maybe the parties to be coming here to meet to say today was give us a week to put up one piece of property, one piece of real property, so that we don't have to have a deep dive into the financial solvency of the sureties here which I think we might have to have otherwise.  That to me constitutes an assurance that the defendant will be likely to return and the degree of moral suasion that right now this case is lacking.  I'm not saying I've landed on a final decision even without that.  I'm saying that would make this case a lot easier.

MS. SACKS:  Judge, I don't think moral suasion here is lacking at all.  First of all, his mother is one of the suretors.  She's in the courtroom today.  One of the conditions is that she has to live with him.  I mean she's going to be standing over him.  You've got two

Transcriptions Plus II, Inc.

29

Proceedings

other suretors who are his apartment mates.  Right?  One of them is like an aunt to him.  That's also moral suasion there.  You have his high school teacher who is one of the suretors.  That's also moral suasion right there.  I think you've got a lot of moral suasion here.  Right?  And I mean --

THE COURT:  Assuming solvency, yes.

MS. SACKS:  And if the police thought that this was so serious, this fight, I mean they haven't even tried to talk to him.  So they tried --

THE COURT:  They did try to talk to him.  I thought they --

MS. SACKS:  They came in June but then they haven't come back.  Their agents had no trouble finding him in his apartment when they wanted to arrest him in this case.  And by the way, this case has been pending in front of Judge Vitaliano since April 2022.  My client was just added to it.

THE COURT:  Right, right.  Yes.  I'm not sure what the relevance of the prior indictment is if your client was not charged in it.

MS. SACKS:  This case has been pending for a while.

THE COURT:  Okay.

MS. SUAREZ:  The government --

30

Proceedings

THE COURT:  What is the -- let's just shortcut this whole thing.  I think that on a motion from the government I have the authority to continue this case over for at least one more business day until Monday.  Right?  And that would give the defense an opportunity to crystallize whatever position they're going to take on whether one single piece of real property can be identified and offered as security for our purposes.  And that's my intention right now is to just say take the weekend, see what you come up with.

I didn't even realize when we sat here today that we have a third surety who has property in the mix.  I'm not saying that person should or should not be willing to post that property.  I'm just saying I'm interested in the question.  What's the government's position on that?

MS. SUAREZ:  The government's position on continuing until Monday is that that's fine.  There are a number of things that I would like to respond to that the defense has raised over the last several minutes that I haven't had an opportunity to respond to yet.  But I can do that today or I can do that on Monday.

MS. SACKS:  Judge, I --

THE COURT:  Can you just give me the list of what you want to respond to without actually responding

31

Proceedings

to those things?  Because there's a lot here that is not going to move the needle for me one way or the other.

MS. SUAREZ:  Sure.  The moral suasion of three of the sureties, the --

THE COURT:  What is your problem with the three sureties?

MS. SUAREZ:  So three of the sureties, the landlord and two of the apartment mates, I just want to make the record clear, two of the apartment mates, these are, as far as the government understands it, apartment inside of an apartment such that when law enforcement went to arrest him in June, two people who are apartment mates that live there declined knowing him at all.

THE COURT:  I am aware of that history, but now they're saying they're willing to go on the hook.

MS. SUAREZ:  The landlord, there has been no proffer of what kind of relationship these two have that it rises to the level of moral suasion.  And in fact, the landlord's daughter was disqualified as a suretor yesterday because of inconsistent statements made to the FBI versus the defense counsel and the Court yesterday.

THE COURT:  So how many sureties do we have now?  Five or six?

MS. SUAREZ:  Six.

MS. SACKS:  Six.

32

Proceedings

THE COURT:  Okay.  What do you know about the solvency of these people?  Do you have financial affidavits from the sureties?

MS. SUAREZ:  I do not have financial affidavits from the sureties.  I have what was on the record yesterday which is that Xin Lin makes $3,000 a month.  She Qin Li makes $20,000 a year.  Xin Ha Ma makes $3,000 a month and is retired, so I'm not sure where that income comes from.  And Ms. Hesseltine makes $80,000 a year.

THE COURT:  So Ms. Hesseltine obviously is going to be in a different category than what I'm about to say as the sureties.  If you're making $36,000 a year or less in New York, I think, although I'm not sure but I'm pretty confident, that that, adjusting for local cost of living, puts you below the poverty line.

I don't know the extent to which these people are paid on the books versus in cash and what the implications of that might be for any future efforts to garnish someone's wages in an effort to collect on the bond.

And perhaps most importantly as to the solvency of the sureties, we don't know anything about the state of their debt.  Obviously solvency is a function of not only somebody's income but also their liabilities.

And so for all those reasons, it seems obvious

33

Proceedings

to me that we either need to know a little bit more about the sureties' picture or we need to see if there is one single piece of real estate that the defense can muster to post as security here.

All that having been said, I think it makes sense to put this case on for a continuance of this hearing, continuation of this hearing on Monday morning.

MS. SACKS:  Judge, respectfully, Monday is a very significant Jewish holiday.

THE COURT:  Oh, yes.  I'm sorry.  Monday is Yom Kippur.  Tuesday morning at 9 a.m. in front of me.  I mean I assume I'm the miscellaneous judge now but not the miscellaneous judge next week.  I would think that because I started this hearing, I should be the judge who finishes it.  But if anybody strenuously disagrees with that assertion, let me know.

MS. SACKS:  This is Judge Vitaliano's case.

THE COURT:  Yes, I'm happy for him to take it up then as well.  If I'm going to be making the decision, I'd want to know more about the financial picture of the sureties and/or the possibility that there will be real property posted as security.

MS. SACKS:  Judge, I mean it's just this is super unfortunate.  Judge Pollak, who is such a seasoned magistrate, and as your Honor has acknowledged, is not an

Proceedings

easy sell on bail, heard this case yesterday and my client was supposed to leave fitted with a bracelet yesterday to go home with his mother. And now he's going to have to spend four more days inside the MDC.

THE COURT: For purposes of making -- I mean the real risk here -- I understand that's not trivial. Believe me. And I have significant concerns about some aspects of the MDC's operations. The bigger question here is, you know, we don't know how long this case is going to take to get to trial and it could be a year. And I think we all have an incentive to get this decision right in light of that duration of time first and foremost.

I completely agree with everything you said about Judge Pollak and her wisdom in these matters, but the way the law operates here is that I have to make a decision myself that I think is the right decision and this is the way I'm approaching it now.

By the way, are there still Saturday morning arraignments in this court or is that not something that happens?

MS. SUAREZ: I have had the blessing of not being on duty for a while, but I understand that there are still Saturday morning arraignments.

THE COURT: Okay. So maybe somebody comes in

35

Proceedings

with property to post tomorrow.  And by the way, the property -- no?

THE CLERK:  No.  Only the judges (inaudible).

THE COURT:  Oh, I see.

THE CLERK:  (Inaudible).

THE COURT:  I mean if you were telling me, for example, that you have an agreement by phone with surety XYZ to post real property, whatever the real property is, I would think seriously about releasing your client today on the condition that that property be posted and whatever security interest perfected within a given period of time but not make your client wait for that to happen.  But at this point we just don't know.

MS. SACKS:  We don't know.  And also we're certainly trying to be resourceful among the family and friends that are in the courtroom.  There is the potential of posting a business.  So we're trying to -- people --

THE COURT:  What does that mean?  Posting somebody's equity in a business or posting the business's real property?

MS. SACKS:  I think it could be the equity in the business or the business's real property.  I'm not sure again because again, with ten minutes and only my cell phone among us, it's sort of hard to figure out.

36

Proceedings

Look, Judge Pollak was willing to --

THE COURT:  I mean it's, just to respond to the ten minutes point, it surprises me that there's been no meaningful investigation of this question even before today's proceeding started.  Right?  You would  have thought that with the government vociferously opposing bail here that at least the defense was on notice that this was in the mix.  And Judge Pollak even herself inquired about it at one point.  But it's neither here nor there.

MS. SACKS:  No.  And with all due respect, I found Judge Pollak's package to be super onerous, quite restrictive, and I think gave every reason on the record to be affirmed.  And she was willing to allow my client to, even though there was a -- the sixth suretor was not available to sign, she was going to allow her to sign by Tuesday and was going to release my client yesterday.

THE COURT:  Okay.  We're going to be around until about 5:30 today.  If you learn something in the next 45 minutes that changes where you sit right now, maybe we don't all need to come back on Tuesday.  Otherwise, I will continue this hearing until Tuesday morning at 9 a.m. and I will plan to see you all then.  But again, if you need us, we're in the building.  The prosecutors are going to be across the street and

37

available.  And if we get a phone call in the next 40 minutes or so, we'll respond.

MS. SACKS:  Okay.  All right.

THE COURT:  Thank you.

MS. SACKS:  Can you provide to me the phone number for your --

THE COURT:  Yes.

(Matter concluded)

-oOo-

**C E R T I F I C A T E**

Transcriptions Plus II, Inc.

38

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **19th** day of **October**, 2023.

_Mary Greco_

Transcriptions Plus II, Inc.