UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
United States of America,                              :
                                                       :
                                   Plaintiff,       :
                                                       :      MEMORANDUM & ORDER
             -against-                            :      22-cr-158 (ENV) (MMH)
                                                       :
Siyang Chen, Yichu Chen,                               :
                                                       :
                            Defendants.      :
                                                       :
------------------------------------------------------------ x

VITALIANO, D.J.

      As a boatload of trial evidence established, defendant Siyang Chen was a leader in a nationwide commercial sex enterprise that brutally assaulted women employed by competing rings as a means of blocking the rival prostitution rings from encroaching on its territory. The days leading up to trial saw the parties take some unusual steps. Chief among them was Siyang Chen's decision to plead guilty to ten counts charged against him in the operative indictment.[1] Min. Entry, ECF No. 420; Hr'g Tr., ECF No. 347-1; Min. Entry, ECF No. 380. For its part, the government announced that it would dismiss, rather than proceed against him, on four other counts of the superseding indictment. Letter Ct. Regarding Trial Indictment, ECF No. 368 at 2290.[2] Then, after a five-week trial, Siyang Chen was convicted by a jury on November 18, 2024, of all six counts against him as set forth in the trial indictment, including Count 1, which charged his membership in a sex trafficking conspiracy. Jury Verdict, ECF No. 421.

---

[1] The Background section, *infra*, provides a description of each charge to which Siyang Chen pled guilty.

[2] Page references to the filings refer to the Electronic Case Filing (ECF) pagination.

1

The evidence at trial comfortably proved that Siyang Chen was a member of a criminal organization run by his wife and co-defendant, Rong Rong Xu,[3] that operated commercial sex outposts far from its command center in Queens. In furtherance of its criminal objectives, the organization dispatched hit squads to brutally batter prostitutes working freelance or for rival prostitution rings. Contemporaneous text messages and testimony from cooperating witnesses who traveled to the outposts and participated in the assaults and robberies of targeted prostitutes gave the jury a blueprint showing how the organization plotted to assault and rob suspected traitorous commercial sex workers and steal their means of communicating with bosses and arranging clients. Siyang Chen has moved under Rule 29 of the Federal Rules of Criminal Procedure to vacate his sex trafficking conspiracy conviction or, in the alternative, moves under Rule 33 for a new trial on the same count. Def.'s Mot., ECF No. 436; *see also* Opp'n, ECF No. 445; Def.'s Reply, ECF No. 447. For the reasons stated below, Siyang Chen's Rule 29 motion for an acquittal on Count 1 of the trial indictment is granted, and his Rule 33 motion is denied as moot.[4]

## Background

Though a foretaste of the pertinent facts has been provided in the opening paragraphs. The

---

[3] Xu pled guilty to Counts 1 and 18 of the superseding indictment on September 6, 2024. *See* Min. Entry, ECF No. 334.

[4] Defendant Yichu Chen was the only charged member of the conspiracy to proceed to trial with Siyang Chen. He was convicted of Count 7 of the trial indictment, the only charge against him, which corresponds to Count 13 of the operative indictment. Jury Verdict, ECF No. 421, at 4426; Gov't's Proposed Jury Instrs., ECF No. 360 at 2191. Yichu Chen made a Rule 29 motion at trial, Tr. 2072:24-2073:3, 2150:19-22, 2639:12, but did not submit additional briefing. His motion is denied as the Court finds there is plentiful evidence that would permit a reasonable jury to infer his guilt on that count. The other ten co-defendants have all pled to one or more of the various counts of the indictment in full satisfaction of the charges against them. *See generally* Docket, case no. 22-cr-158.

Court generally presumes the parties' familiarity with the facts and procedural history of the case and limits its recapitulation of the background facts, which will be interspersed throughout the balance of this opinion and limited to the demands of context. Recapitulated or not, the evidence will be viewed in the light most favorable to the government, as caselaw requires. *See United States v. Reifler*, 446 F.3d 65, 94-95 (2d Cir. 2006).

As mentioned earlier, the procedural steps taken by the parties prior to trial were a bit unorthodox. Siyang Chen pled guilty to Counts 1, 3, 4, 5, 6, 8, 9, 11, 12, and 13 of the superseding indictment. Min. Entry, ECF No. 420, Hr'g Tr., ECF No. 347-1; Min. Entry, ECF No. 380. These counts had charged Siyang Chen with racketeering, prostitution, money laundering, and assault with a dangerous weapon in-aid-of racketeering. *See generally* Superseding Indictment, ECF No. 133. Trimming its trial objectives, the government announced its intention to dismiss Counts 18, 19, 30, and 31, which were other assault charges, and proceeded to trial with those counts left on the sidelines. Letter Ct. Regarding Trial Indictment, ECF No. 368 at 2290. In addition to the sex trafficking charge (Count 1), the jury convicted Siyang Chen on Count 2 (Hobbs Act Robbery Conspiracy) and Counts 3-6 (Assault with a Dangerous Weapon In-Aid-Of Racketeering) of the trial indictment. Jury Verdict, ECF No. 421. The counts of conviction correspond to Counts 2, 7, 20, 21, 22, and 24 of the superseding indictment. Gov't's Proposed Jury Instrs. at 2191.

<u>Legal Standards</u>

Under Rule 29, a trial court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." But such relief is subject to a "heavy burden" on the moving defendant. *United States v. Hamilton*, 334 F.3d 170, 179 (2d Cir. 2003). A Rule 29 motion requires the trial court to review the trial evidence, as noted earlier, "in the light most favorable to the prosecution," and determine whether "*any* rational trier of fact could have found

3

the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L.Ed. 2d 460 (1979). The Court must "credit every inference that could have been drawn in the government's favor and affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt." *United States v. Reifler*, 446 F.3d 65, 94-95 (2d Cir. 2006) (citations omitted). Importantly, the evidence must be considered "not in isolation but in conjunction" with all other material evidence and inferences reasonably drawn from it, but still viewed in the light most favorable to the prosecution. *Id.*

Bluntly, the hill a defendant must climb to succeed on a Rule 29 motion is extraordinarily steep. It is not merely that the trial court disagrees with a jury's finding of guilt, which is just the first step at the bottom of the hill. Instead, Rule 29 acquittal is only permissible where "the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" *United States v. Guadagna*, 183 F.3d 122, 130 (quoting *United States v. White*, 673 F.2d 299, 301 (10th Cir. 1982)). It is the qualitative impact of the credible evidence and the reasonable inferences drawn from it, all viewed in the government's favor, that is the animus of a Rule 29 motion. *Reifler*, 446 F.3d at 94-95.

Drawing critical attention to the lone offense of conviction that is the subject of this motion, the crime of sex trafficking, by its plain language, substantively requires that a defendant knowingly recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person, "knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or any combination of such means *will be used to cause the person to engage in a commercial sex act*." 18 U.S.C. § 1591(a) (emphasis added). The offense must also affect interstate commerce. *Id.* Here, of course, to prove the charged sex

trafficking conspiracy, the government need also establish that (1) from in or about and between April 2019 and September 2021, there was an agreement or understanding among two or more persons to sex traffic a person, and (2) that the defendant unlawfully, intentionally, and knowingly became a member of that conspiracy. *United States v. Ray*, No. 20-CR-110 (LJL), 2022 WL 17175799, at *6 (S.D.N.Y. Nov. 23, 2022). Critically, as legislative history and judicial interpretation make clear, causality is an essential element; the government must prove that some form of force or compulsion was used with knowledge or reckless disregard that it would be used to cause another to perform a commercial sex act.[5]

## Discussion

If Congress intended when it adopted 18 U.S.C. § 1591 to ensure a marketplace for a thriving commercial sex industry free from predatory anti-competitive acts, especially those with roots in physical violence, fraud or duress, Siyang Chen would be as guilty as sin of the § 1591 violation charged in Count 1. Through intuition alone, we can surmise that the establishment of a thriving commercial sex marketplace was not Congress's objective when it passed § 1591. But there is no need for surmise. Confirmed by legislative history, H.R. Rep. No. 106-487, pt. 1, at 16 (1999), and far more importantly, from the clarity of the statutory language, it is clear that § 1591 was designed as part of a package of laws set in motion to put an end to human trafficking. For its part, § 1591 was enacted to criminalize and punish those who use some form of force (the causality element) to induce others to perform commercial sex acts.

The stark reality is that for the thousands of chat and text messages, hundreds of victim and

---

[5] Admittedly, it is not broken out as a separate element, but is still seen as essential, in Sand's Modern Federal Jury Instructions. *See David v. Weinstein Co.*, 431 F. Supp. 3d 290, 302-03 (S.D.N.Y. 2019); *see also United States v. Corley*, 679 F. App'x 1, 7 (2d Cir. 2017).

crime scene photographs, dozens of video clips, the testimony of investigators from across the country, and the stories cooperating witnesses told the jury, none of the evidence produced at trial, either discretely or conjunctively, would permit a reasonable jury to find beyond a reasonable doubt that Siyang Chen was a member of a conspiracy the purpose of which was, with knowledge or reckless disregard, to use force, threats of force, fraud, coercion, or any combination of such means to cause, or to attempt to cause, one or more persons to engage in commercial sex work. The evidence, quite compellingly, was to the contrary. The point of beating the organization's own prostitutes was not to force them to keep working for the organization but to prevent them from working for rival commercial sex organizations. Indeed, making manifest the absence of proof that would enable a reasonable juror to find that the government had proved the causality element of a sex trafficking charge, the net and cumulative effect of the robberies and beatings of prostitutes working for rival prostitution rings was to prevent them from performing commercial sex work for anyone.[6] The "message" to the beaten workers was simple: you are free to stop working in the commercial sex industry but if you choose to work for a rival prostitution ring in our territory, you will be beaten again. Viewed in the light most favorable to the government, that is the only fair interpretation of the facts that the evidence permits.

      The prosecution's working principle is far simpler and appears to rest on little more than temporality. Put formulaically, the beating of a commercial sex worker as ordered by the prostitution ring leaders followed by beaten worker continuing to perform commercial sex work for the prostitution ring equals sex trafficking. The words of the statute require much more; a showing, as applicable here, that the beating of the commercial sex worker was inflicted knowing

---

[6] For example, a prime objective of the robberies was to seize the prostitutes' cell phones, which was virtually the exclusive means by which these commercial sex rings book services. Tr. 412:9-24; 415:2-8, 808:9-809:3. In short: No phone, no business.

or in reckless disregard that it would cause the victim to continue to perform commercial sex work is required. For instance, under §1591, a showing of "coercion" requires proof that the defendant engaged in "any scheme, plan, or pattern *intended to cause a person to believe that failure to perform an act* would result in serious harm to or physical restraint against any person." 18 U.S.C. § 1591(e)(2)(B) (emphasis added). Similarly, coercion through a threat of "serious harm" refers to harm "that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm." 18 U.S.C. § 1591(e)(5). In other words, the very language of the statute links the force, fraud, or coercion to causing an unwilling participant to engage in commercial sex—the causality element.

To be sure, the legislative history of the Trafficking Victims Protection Act, which established § 1591, also underscores a plain language distinction between those induced to commit commercial sex acts and those who have consensually engaged in prostitution. H.R. Rep. No. 106-487, pt. 1, at 16 (1999). A House report from the Committee on International Relations noted that sex trafficking by force, fraud, or coercion is defined as sex trafficking "induced" by those factors. *Id.* at 19-20 (1999). Quoted in the Congressional Record, Rep. John Conyers described the language of § 1591 as applying only to "those prostitution offenses that implicate a liberty interest under the 13th amendment because they involve coercion." 153 Cong. Rec. H14114 (daily ed. Dec. 4, 2007) (statement of Rep. Conyers) (discussing an attempt to rebrand it as an "aggravated sex trafficking" offense during a 2007 reauthorization).

As an unsurprising consequence, then, courts around the country have consistently agreed that § 1591 requires force, the threat of force, or coercion be used to induce someone to commit a commercial sex act. *See United States v. Graham*, 707 F. App'x 23, 27 (2d Cir. 2017) (finding

causation an essential element of the offense); *see also David v. Weinstein Co. LLC*, 431 F. Supp. 3d 290, 302-03 ("A plaintiff's sex trafficking claim thus survives if she pleads that the defendant enticed her while knowing that *he would cause her* to engage in a commercia sex act, regardless of whether that act ultimately occurs.") (emphasis added). Coercion is defined as "threats of serious harm to or physical restraint against any person," a "scheme, plan or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person," or "the abuse or threatened abuse of law or the legal process." 18 U.S.C. § 1591(e)(2)(A)-(C). "What the statute requires is that the defendant know in the sense of being aware of an established modus operandi that will in the future coerce a prostitute to engage in prostitution." *United States v. Chang Ru Meng Backman*, 817 F.3d 662, 666 (9th Cir. 2016) (quoting *United States v. Brooks*, 610 F.3d 1186, 1197 n. 4 (9th Cir. 2010)); *see also Gardner v. United States*, 122 F.4th 254, 260 (6th Cir. 2024), *reh'g denied*, No. 23-1388, 2025 WL 439740 (6th Cir. Jan. 15, 2025)) ("[T]he government had to prove that [the defendant] knowingly engaged in a trafficking act knowing that force, threats of force, fraud, or coercion 'w[ould] be used to cause' [the victim] 'to engage in a commercial sex act.'"). Even if force was not used to force the victims to enter into prostitution in the first place, it can sustain a conviction if it caused them to engage in particular commercial sex acts. *See id.*

Importantly, the force inquiry brings up the caveat that force merely incidental to the commercial sex trade does not suffice. *See Lawson v. Rubin*, No. 17-cv-6404 (BMC), 2018 WL 2012869, at *14 (E.D.N.Y. Apr. 29, 2018). The force needs to have influenced the nature of the acts to be performed, or caused the individual to engage in commercial sex work. *See also Fan v. Jiang*, No. 23-16215, 2024 WL 4987251, at *1 (9th Cir. Dec. 5, 2024) (finding the "requisite causation element [was] absent" where sexual abuse resumed upon the victim's voluntary return

8

to her workplace because plaintiff did not plead that she was recruited, enticed, transported, etc. for the purpose of engaging in commercial sex acts). A conviction for sex trafficking cannot stand in the absence of proof that force, threats of force, fraud, or coercion was employed to coerce the victim to perform commercial sex against her will.

Week after week of trial, beating after beating, the government piled high the evidence that assailants doing the work of a conspiracy that included Siyang Chen used force against commercial sex workers plying their trade on behalf of the organization. The government proclaims it; defendant does not dispute it. Yet, that gets the evidentiary bridge to conviction only halfway across the river. Yes, the jury saw and heard the powerful stories of commercial sex workers who were savagely beaten and robbed, but no evidence that the violence was connected to any effort by the organization to keep them performing commercial sex work.[7] Each of the stories is powerful, brutal, and sad, but neither individually nor in combination can these stories alone support the conviction of Siyang Chen for sex trafficking as charged in Count 1 of the trial indictment for these evidentiary tales offer no proof of knowledge or reckless disregard that these workers would be compelled to continue performing commercial sex work or permit a rational jury to infer that was the purpose of the criminal conspiracy.

Reinforced by the government's opening and closing arguments that made this very point, the evidence the government marshaled for the jury made a cohesive showing that the organization's principal concern was competition from rival prostitution rings, including that some of their own commercial sex workers were working for those rivals in various now-competitive

---

[7] See the accounts of individual assaults and robberies educed by the government at trial, including Tr. 185-86, 457-470, GX 601Q, 601S, 601T, 2001, 547, 701A (regarding Xu Mei); Tr. 1027-30, GX 434 at 112 (regarding Ping Jing); Tr. 1034-35, GX 622D, 622K, 622L, 622M, 622P, 622U, 622Y, 622Z (regarding Man); GX 434-VA-T, 705A, 2130, 2090 (regarding Liping).

9

marketplaces. The evidence presented by the government told the story of the organization ratcheting up the war against other sex businesses through police raids to shut down competitors and warnings to its own sex workers that the boss would "beat the living daylight" out of girls who started doing sex work on their own.[8] Tr. 1019:24-1022:21, GX 415E-T, GX 434-T at 99. The assault and robbery of commercial sex workers—including the conspiracy's own employees—was increasingly brutal over the course of the conspiracy, but the proof, whether by direct evidence or reasonable inferences from it, has shown: the use of force was part of an anticompetitive effort to protect the prostitution ring run by the conspirators from others in the market and not to overbear the will of victims who did not wish to engage in the commercial sex industry.

No evidence at trial showed any of the victims of the organization's assaults and robberies felt compelled to continue working as a sex worker due to the beatings, either for the organization itself or elsewhere. Often, this story was laid out through the government's own cooperating witnesses. Tr. 1164:19-25. One of the Organization's sex workers was beaten for working for a rival. Tr. 186:15-22, 192:13-193:10. One cooperator testified: "[Rong Rong] Xu think this is a threat." Tr. 192:20. The evidence showed an intent to stop her from working, rather than to have her continue performing sex work. A second of the Organization's former sex workers was beaten in a case of mistaken identity. The government does not dispute the Organization did not know it was going to beat its former employee. Opp'n at 4628-29; *see also* Tr. 1030:2-7 ("Initially, [Xu] did not know why Jing was beaten up. [. . .] And later on, she find out that the girl who worked

---

[8] The organization used police raids to shut down competitors. The use or abuse of the legal process can be coercion under § 1591, but the evidence at trial did not show the organization's actions fell into such a category. The raids were meant to stop rival brothels and limit their own sex workers' employment options. No evidence suggested that the raids, on their own or in combination with other actions by the organization, were intended to or could have the effect of compelling women to work as prostitutes, and no reasonable jury could base its guilty verdict on such a finding.

10

for her was being beaten up because she worked for another boss."). The organization, though happy it had assaulted a someone working for another boss, was operating to protect its turf rather than to coerce women into commercial sex on its behalf.

In another case, a cooperating witness testified that a sex worker formerly employed by the enterprise now worked for someone else, and was beaten so "that message will spread out and people know about it, so, you know, people would not dare to do that type of things in the future . . . become an adversary of [Rong Rong Xu's] and compete with her same place." Tr. 1034:23-1035:5. Far from inducing her to perform commercial sex work, the assault was intended to put her out of business. A fourth, by the government's own account, had worked for the organization in 2019, but was assaulted in November 2020 while working for another boss. Opp'n at 4629. No evidence presented at trial suggests the organization wanted these women to engage in sex work after the assaults, or that the women felt pressured to do so. No evidence showed any of the women worked for the organization after being assaulted. At the end of the day, whether or not the victims understood exactly who assaulted them does not matter, because the only message they received was to cease commercial sex work in that location. Not a shred of evidence was offered that would permit a reasonable inference that the message of the beating could be construed in any other way.

Other evidence admitted at trial highlights the brutality of the organization but does not support an inference of a sex trafficking conspiracy. The organization's collection of personally identifying materials and information would be used against women who "decided to work for herself or a rival, instead of the Organization," according to the government's own understanding. Opp'n at 4630. As before, the testimony supports the idea that a woman who quit the sex trade

11

altogether had nothing to fear from the organization.[9] In fact, Yuan Yuan Chen, one of the cooperating witnesses presented by the government at trial, testified that she quit sex work after working for the organization, only to be brought back later in another role. Tr. 1190:15-22. Indeed, testimony that people quit working for the organization and then returned because it was a preferable employment option is suggestive of consent to prostitution. *United States v. Rivera*, 799 F.3d 180, 186 (2d Cir. 2015).

This panoramic view of the assault and robbery strategy of the conspirators, the seamless execution of that strategy by the goons they hired, and the reaction of the victims is of great import for a jury in search of the causality element. That is because it is fundamental to a proper understanding and application of § 1591 that jurors look at each coercive act not in isolation, but in conjunction with the "entire course of the defendant's […] conduct." *United States v. Delaney*, No. 18-1919, 2022 WL 356731, at *3 (7th Cir. Feb. 7, 2022). For instance, courts have sustained sex trafficking conspiracy convictions where a defendant knew of overseas sex trafficking, knew that women were under debt to the organization, and worked closely with a woman who owned debt. *See United States v. Unpradit*, 35 F.4th 615, 626 (8th Cir. 2022). Convictions have likewise been sustained where a defendant witnessed a co-conspirator beating a woman he prostituted, and that, combined with his level of involvement in the prostitution business, could have led the jury to believe he knew the victim was being coerced into prostitution. *United States v. Fuertes*, 805 F.3d 485, 502 (4th Cir. 2015). As they have where evidence showed a defendant knew women

---

[9] Evidence introduced by the government showed the IDs the organization collected were also used to verify women's identities in online sex work advertisements. Cooperating witness Yuan Yuan Chen testified that, if anything, the materials were meant to be used by Xu to badmouth and punish women who began working against her, instead of those who left the sex trade. Tr. 1041:7-17 (testifying it was to be used against "girls when go on to work for another boss, it becomes adversary").

had been financially incentivized to move to a place where they then, through a bait-and-switch, were told they would have to become prostitutes. *United States v. Chang Da Liu*, 538 F.3d 1078, 1085 (9th Cir. 2008). Neither the government's proof nor its argument to the jury suggests that anything even remotely analogous occurred here. Rather, its proof and argument convincingly established that the organization's sins were brutal antitrust tactics designed to drive rival sex workers out of competitive markets, and not to coerce anyone into performing commercial sex.

Furthermore, the government offered no Rosetta Stone evidence that commercial sex workers employed by the organization could decipher the assaults and robberies perpetrated by the organization's goons any differently—so that a robbery that actually prevented a commercial sex worker from working was really calculated in masquerade to compel them to work for the organization. As the government points out in its briefing, the standard with respect to coercion is a "hybrid" having subjective and objective aspects. Opp'n at 4631. A defendant's behavior may be coercive when it is "sufficiently serious to cause both the victim[] and reasonable people of the same background and in the same circumstances to feel coerced." *United States v. Rivera*, 799 F.3d 180, 186-87 (2d Cir. 2015).[10] Like any other elemental showing, though, the government's contention need be rooted in facts, not speculation. There was evidence, of course, about how the organization recruited, contacted, and hired commercial sex workers; how arrangements were made for their travel to and how they began work in designated territories, but no victim, cooperator or not, was ever called to testify about anything that any member of the

---

[10] Evidence shows sex workers like the victims were savvy and understood their legal options and protections, thus making them less likely to feel coerced. For instance, in a group chat, one told others to "[c]all the police" after an assault because "[b]eating people is against the law." GX416N-P-T. The message implies bosses who "monopolize[]" locations are not uncommon, and the workers share information about how they "can apply for victim visa, can even get the green card" in the case of an assault. *Id.*

13

organization did or said which they believed it compelled them to perform commercial sex work against their will. In point of fact, cooperator Yuan Yuan Chen testified that, after she stopped performing commercial sex work for the organization, that she was neither threatened nor harmed, and was actually rehired by the organization in a new and more significant role.  Tr. 1190:20-22.

In sum, the evidence at trial showed Siyang Chen was part of a brutal criminal organization that engaged in a plethora of illegal activities, including prostitution and the robbery and assault of prostitutes working for rival sex organizations.  The conduct was cruel and despicable, and, as evidenced by the 15 counts of which he stands convicted, surely criminal and most violent but, as criminal as all of that conduct was, none of it was in furtherance of a conspiracy in violation of § 1591 as charged in Count 1 of the trial indictment; and no reasonable jury could so find. For that reason, Siyang Chen's motion under Rule 29 for acquittal on that charge must be granted.

## Conclusion

For the foregoing reasons, Siyang Chen's Rule 29 motion for a judgment of acquittal, notwithstanding the verdict of the jury, on his conviction for sex trafficking conspiracy as charged in Count 2 of the superseding indictment is granted, and his motion, in the alternative, for a new trial under Rule 33 is denied as moot.  The motion of Yichu Chen under Rule 29 upon which the Court heard argument at the time of trial is denied.

So Ordered.
Dated:   Brooklyn, New York
            July 7, 2025

/s/ Eric N. Vitaliano
ERIC N. VITALIANO
United States District Judge